IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| JASON J. HERNANDEZ | § | |
| VS. | § | CIVIL ACTION NO. 9:20-CV-196 |
| GREG ABBOTT, *et al.*, | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Jason J. Hernandez, an inmate confined at the Polunsky Unit with the Texas

Department of Criminal Justice, Correctional Institutions Division, proceeding *pro se,* filed the

above-referenced civil rights action pursuant 42 U.S.C. § 1983 against defendants Brian Collier,

Executive Director of the Texas Department of Criminal Justice, Robert Grant, former Polunsky Unit

Program Supervisor V of the Security Threat Group Management Office, Tod Harris, former Warden

Polunsky Unit, Eva Shiver, current Polunsky Unit Program Supervisor V of the Security Threat

Group Management Office, and Michael Butcher, former Warden Polunsky Unit.

The above-styled action was referred to the undersigned Magistrate Judge pursuant to 28

U.S.C. § 636 and the Local Rules for the Assignment of Duties to the United States Magistrate Judge

for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Relevant Background

As outlined in the 2015 TDCJ Security Threat Group Plan (Exhibit E), defendants offer the

following relevant background:

During the 1990s, the Texas Department of Criminal Justice ("TDCJ")
experienced the largest offender population growth in its history. The total
offender population grew from 50,720 in fiscal year 1991 to 128,468 in fiscal
year 1995 to 150,367 in fiscal year 2015. With the population growth, the

TDCJ also began to see an increase in gang activities, formally known as Security Threat Group (STG) related activities.

To meet the timely demands of monitoring and validating STG members and their activities, in October 1996, the TDCJ established the Security Threat Group Management Office (STGMO).  Under the direction of the deputy director of Management Operations, the STGMO manages an information network to share data between TDCJ Correctional Institutions Division (CID) units and various state and federal law enforcement agencies.  The STGMO also provides training to unit and regional STG staff to ensure consistency among all TDCJ CID units in the management of these offenders.

The STGMO reviews each group and its members to determine who shall be recognized by the TDCJ CID as being an STG, disruptive group, or clique. An offender's affiliation with a "free-world" group or another prison system does not automatically make the offender a threat within the TDCJ.  Each group and offender is reviewed and evaluated on a case-by-case basis.

The Gang Renouncement and Disassociation (GRAD) and the Administrative Segregation Diversion Program (ASDP) provide methods for offenders to renounce their membership in an STG and return to general population.

Defendants' Motion for Summary Judgment, pgs. 7-8 (docket entry no. 14) (citations omitted).

<u>The Complaint</u>

Plaintiff alleges his Fourteenth and Eighth Amendment constitutional rights have been violated while confined in administrative segregation as a result of gang validation.  According to plaintiff, he was placed in administrative segregation in November of 2010 due to his gang validation when he entered TDCJ.  Plaintiff states he was transferred to the Polunsky Unit in March of 2011 and his placement in administrative segregation has continued through this day.  Plaintiff's chief complaints are two-fold.

First, plaintiff alleges that through TDCJ policy, he is being forced to either "debrief" or endure the "crushing and inhumane" conditions of administrative segregation which allegedly constitutes torture.  Plaintiff states TDCJ requires debriefing despite acknowledging that "an

individual who divulges secret information about his gang might be a target of violence by fellow gang members." According to plaintiff, upon completion of "GRAD" prisoners must first agree to sign a waiver stating TDCJ is not liable for any potential injury to the prisoner before he is released to the general population. As such, plaintiff alleges the defendants implement and enforce a policy which is deliberately indifferent to his health and safety.

Plaintiff next contends he is being denied due process through the gang validation process. Plaintiff concedes that once a prisoner is validated as a gang affiliate and sent to administrative segregation for an indefinite term, he is entitled to periodic review of his validation and paperwork in his file. Plaintiff states, however, that unless a prisoner is willing to debrief, "the annual hearing (for STG only) by ASC, allows absolutely no possibility for release" from administrative segregation. Plaintiff specifically complains that "[n]o examination of continued gang activity or association occurs at the annual hearing by the ASC, nor is there any assessment of whether the prisoner's behavior requires continued SHU placement." Plaintiff states that despite his demonstrated ability to follow prison rules by avoiding significant prison misconduct and not being disciplined for violating a major prison rule in at least seven years, he is still being denied review and placement into the general population. Plaintiff contends that the defendants' policy of retaining inmates in administrative segregation when there is no reliable evidence to support the allegation that he presents a threat of gang-related violence or misconduct is "unmoored from any legitimate penological or security need." As long as plaintiff is housed in administrative segregation, he contends he will never be eligible for parole. Plaintiff asserts he has no meaningful notice of what he must do to earn release apart from debriefing and the length of time between reviews is too long to comport with constitutional due process standards.

With respect to his injuries, plaintiff states TDCJ's "uniquely harsh regimen of prolonged administrative segregation at Polunsky and within TDCJ's SHUs, is inhumane and debilitating." He goes on to say he:

> [L]anguishes, alone, in a cramped, concrete cell, with a small window that's only 3 inches vertically by 4 feet horizontally and which sits across the top back wall of the cell 3 inches to the ceiling, for 22 and one-half to 24 hours a day. He is denied telephone calls, contact visits, and vocational, recreational, educational, and religious programming – denied group prayer, and group meals. Defendants persistently denied plaintiff Hernandez the normal human contact necessary for a person's mental and physical well-being. These tormenting and prolonged conditions of confinement have produced harmful and predictable psychological deterioration to plaintiff.

Amended Complaint, pg. 11. Plaintiff states his physical health has further deteriorated and he has been diagnosed with hypertension and Hepatitis C and suffers from swelling in his legs. Supplemental Complaint (docket entry no. 48).

Plaintiff seeks injunctive relief and a declaratory judgment that the length and conditions of his confinement in administrative segregation violate the Eighth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983. Plaintiff also seeks compensatory and punitive damages.

The Court previously granted in part and denied in part the Defendants' Motion to Dismiss (docket entry no. 1). The Defendants filed their Answer on September 29, 2020 (docket entry no. 9) and a Docket Control Order was entered (docket entry no. 11). Defendants filed their Motion for Summary Judgment on November 16, 2020 (docket entry no. 14). Plaintiff filed his Response in Opposition on January 11, 2021 (docket entry no. 27).

This Report and Recommendation considers Defendants Motion for Summary Judgment (docket entry no. 14), Plaintiff's Response in Opposition (docket entry no. 27), Defendants Reply

(docket entry no. 29) and Plaintiff's Response (docket entry no. 31).

Defendants' Motion for Summary Judgment

Defendants argue the following: (1) plaintiff is not entitled to compensatory damages under the Prison Litigation Reform Act (PLRA) as he does not have a physical injury that is more than *de minimis*, (2) plaintiff's allegations do not rise to the level of a constitutional violation, (3) plaintiff is not entitled to injunctive relief, and (4) defendants are entitled to qualified immunity. *See generally*, Defendants' Motion for Summary Judgment (docket entry no. 14).

Defendants rely on the following summary judgment evidence:

Exhibit A:    American Correctional Association's Accreditation Report for the Polunsky Unit

Exhibit B:    Offender Orientation Handbook

Exhibit C:    TDCJ Classification Plan

Exhibit D:    Hernandez's relevant Unit Classification Committee and State Classification Committee records

Exhibit E:    TDCJ Security Threat Group Plan, including GRAD and ASDP procedures

Exhibit F:    Portions of Hernandez's STG file and Classification Review Screenshots

Exhibit G:    TDCJ Restrictive Housing Plan

Exhibit H:    Hernandez's relevant Grievance Records

*Id.*

Plaintiff's Response In Opposition

As to his Eighth Amendment claim, plaintiff argues he has suffered both physical and psychological harm directly connected to his long-term confinement in administrative segregation

and that due to this long-term unconstitutional confinement, he faces a substantial risk of serious harm; a serious harm to which the defendants were and are deliberately indifferent.  Response, pgs. 5-6 (docket entry no. 27-2).  Plaintiff states he has alleged both physical and psychological injuries that are more than *de minimis* and are directly connected to his approximately ten plus years in continuous administrative segregation.  In addition, plaintiff argues that GRAD and the Administrative Segregation Diversion Program pose an unreasonable risk to his health and safety.  *Id*., pg. 17. With respect to his Fourteenth Amendment claim, plaintiff states his decade in administrative segregation implicates a liberty interest and that he plausibly alleges the process accorded him is a sham.  *Id*., pg. 18.  Plaintiff finally argues the defendants are not entitled to qualified immunity.  *Id*., pgs. 29-30.

Plaintiff relies on the following evidence:

Exhibit A:    Plaintiff's Relevant Medical Record

Exhibit B:    Plaintiff's Relevant Medical Record

Exhibit C:    Plaintiff's Relevant Inmate Requests to Officials

Exhibit D:    Plaintiff's Relevant Medical Record

Exhibit E:    Plaintiff's Relevant Sick Call Request

Exhibit F:    Relevant Article "Texas Prisons Eliminate Use of Solitary Confinement for Punitive Reasons."

Exhibit G:    Relevant Investigative Report "A Solitary Failure: The Waste, Cost and Harm of Solitary Confinement in Texas."

Exhibit H:    Relevant Article "Ex-Gangster Denounces Gang, and is Shot Dead."

Exhibit I:    Relevant Pages of Offender Orientation Handbook

Exhibit J:    Relevant Pages of TDCJ Classification Plan

6

Exhibit K:    Relevant Pages of TDCJ Restrictive Housing Plan

Exhibit L:    Relevant Pages of American Correctional Association's Accreditation Report for the Polunsky Unit (2018)

Exhibit M:    TDCJ Security Threat Group "On the Inside" Pamphlet, and Administrative Segregation Diversion Program Pamplet

Exhibit N:    Plaintiff's Relevant Medical Record

Exhibit O:    TDCJ Administrative Directive

Exhibit P:    Relevant Pages of TDCJ Security Threat Group Plan

Exhibit Q:    Plaintiff's Relevant Pages of his Disciplinary Records, Unit Classification Committee and State Classification Committee Records

Exhibit R:    Plaintiff's Relevant Grievance Records and Inmate Request to Official

Exhibit S:    Plaintiff's Relevant Grievance Reocrds

Exhibit T:    Relevant Investigative Report "Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment."

Exhibit U:    Plaintiff's Complaint on Human Rights Violations

Exhibit V:    Plaintiff's Statement of Disputed Factual Issues

Exhibit Z:    Plaintiff's Declaration in Support of his Opposition to Defendants' Motion for Summary Judgment.[1]

## Uncontested Facts

Defendants concede these facts for purposes of their Motion for Summary Judgment:

TDCJ policy requires that the Unit Classification Committee or UCC evaluate an offender to determine their appropriate classification and housing assignment. The primary function and objective of the UCC is to classify each offender to ensure the safety, security, and treatment needs of each

---

[1]Plaintiff skipped designations for Exhibit W, X and Y.

offender are met and that the safety and security of the staff, the prison, and the public are maintained.

TDCJ promulgates procedures for UCC hearings as outlined in the Unit Classification Process. TDCJ policy also requires subsequent periodic reviews of offender classifications.

In addition to the UCC, TDCJ also provides for a State Classification Committee or SCC. The SCC is responsible for reviewing and approving an offender's placement; the SCC must regularly visit TDCJ units to conduct scheduled reviews of offenders assigned to administrative segregation.

TDCJ also promulgates procedures for GRAD and ASDP as part of its overall Security Threat Group Plan.

TDCJ correctional facilities are accredited every three years under the American Correctional Association's procedures and guidelines.

Hernandez, a repeat offender, re-entered TDCJ in or about 2009 to serve a 13-year sentence for theft and burglary. At intake into TDCJ, Hernandez was found to be a member of Mexican Mafia (MM), an organized prison gang. Due to his gang affiliation, Hernandez was assigned to restrictive housing as a safety and security measure.

Hernandez acknowledges that he [sic] entitled to, and has received, periodic review of his gang affiliation and STG member validation. In his pleadings, he asserts, "Once a prisoner is validated as a gang affiliate. . . he is entitled to periodic review of his validation and reviews of the paperwork in his file to make sure all required paperwork is accounted for."

Hernandez acknowledges he has been continuously provided the opportunity to participate in the GRAD program and debrief in order to be released from restrictive housing. Hernandez acknowledges he receives State Classification Committee reviews and an annual review. Finally, Hernandez acknowledges he receives one parole hearing per year. During multiple reviews, the SCC determined that Hernandez would remain appropriately assigned to restrictive housing due to his continued gang validation as a member of MM.

Defendants' Motion for Summary Judgment, V. Statement of Facts (docket entry no. 14) (citations

omitted).

Standards of Review

*A.  Motion for Summary Judgment Under FRCP 56*

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and one party is entitled to judgment as a matter of law.  FED. R. CIV. P. § 56(a).  Courts must consider the record as a whole, including all pleadings, depositions, affidavits, interrogatories and admission on file, in the light most favorable to the non-movant.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact and informing the court of the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which support its contention.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988).  Any controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

If the moving party makes the required showing, then the burden shifts to the non-movant to show that a genuine issue of material fact remains for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991) (citation omitted).  The non-movant cannot merely rest on the allegations of the pleadings, but must establish that there are material controverted facts in order to preclude summary judgment.  FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (citation omitted).  Summary judgment is proper if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof.

9

*Celotex*, 477 U.S. at 322-23; *ContiCommodity Servs., Inc. v. Ragan*, 63 F.3d 438, 441 (5th Cir. 1995) (citations omitted).   Furthermore, there must be adequate proof in the record showing a real controversy regarding material facts.  "Conclusory allegations," unsubstantiated assertions, or the presence of a "scintilla of evidence" is not enough to create a real controversy regarding material facts.  *See, e.g., Lujan v. National Wildlife Federation*, 497 U.S. 871, 902 (1990); *Hopper v. Frank*, 16 F.3d 92, 96-97 (5th Cir. 1994); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994).

*B.  Qualified Immunity*

The defendants have invoked the defense of qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"A public official is entitled to qualified immunity unless the plaintiff demonstrates (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."  *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012) (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)).

After an official has asserted the defense of qualified immunity, the burden is on the plaintiff to "rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the

official's conduct." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008); *see also Voss v. Goode*, 954 F.3d 234, 238 (5th Cir. 2020) ("A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.") (quoting *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc)).

A reviewing court may address the two prongs of the qualified immunity analysis in any sequence, depending on the circumstances of the case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017).

<u>Discussion</u>

*A. Timeliness of Plaintiff's Response*

Defendants argue Plaintiff's Response to their Motion for Summary Judgment is untimely and should not be considered by the court. The Docket Control Order entered October 1, 2020, states that plaintiff's response to any motion for summary judgment, motion to dismiss or any other dispositive motion was due December 16, 2020 (docket entry no. 11).

As previously stated, Defendants filed their Motion for Summary Judgment on November 16, 2020, as ordered (docket entry no. 14). Plaintiff's Motion Requesting an Extension of Time to Submit his Opposition to Defendants' Motion for Summary Judgment was dated December 2, 2020 pursuant to the Certificate of Service although not received and filed by the Clerk of Court until December 17, 2020 (docket entry no. 23). The envelope and postage containing Plaintiff's Response to Defendants' Motion for Summary Judgment was dated January 5, 2021 and ultimately docketed by the Clerk of Court on January 11, 2021 (docket entry no. 27).

11

While Plaintiff's Response to Defendants' Motion for Summary Judgment was not mailed until twenty days past the deadline, Plaintiff's Motion Requesting an Extension of Time was filed fourteen days before the deadline. Because plaintiff had yet to receive an order from this Court addressing his request for an extension, plaintiff, out of an abundance of caution, ultimately composed and filed his response. This court will not punish plaintiff for the delay given his motion requesting an extension was filed before the deadline and was requested in order to obtain additional discovery which this court ultimately denied. Furthermore, the defendants have had adequate time to reply to plaintiff's Response and did so on January 14, 2021.

B. *Exceptionally Harsh and Infrequently Imposed*

In Plaintiff's Response to Defendants' Motion for Summary Judgment, plaintiff references *Bucklew v. Precythe*, 139 S.Ct. 1112, 1123 (2019), for the proposition that "the Eighth Amendment places categorically off-limits certain punishments that are both exceptionally harsh and frequently imposed." Response, pg. 5. Plaintiff argues that the Supreme Court has determined that this is a second standard in which a plaintiff can establish a violation of his Eighth Amendment constitutional right, the first being through the deliberate indifference standard. *Id*. Defendants argue this alternative standard should not be considered as plaintiff failed to plead this standard in his complaint. Reply, pg. 2 (citing *Putty v. Fed. Nat'l Mortg. Ass'n*, 736 F. App'x 484 (5th Cir. 2018), *Amedee v. Shell Chem., LP-Geismer Plant*, 384 F.Supp.3d 613, 638 (M.D.La. 2019), *aff'd sub nom. Amedee v. Shell Chem., L.P.*, 953 F.3d 831 (5th Cir. 2020)).

While the court agrees that a claim not raised in a complaint but, rather, raised only in response to a motion for summary judgment is not properly before the court, the court also notes that in reviewing *Buckew v. Precythe*, this court could find no reference to the "exceptionally harsh and

12

frequently imposed" standard cited by plaintiff. Furthermore, while plaintiff cites to this alleged alternative deliberate indifference standard, plaintiff does not appear to invoke the standard in any analysis of his deliberate indifference claim. This court will not consider any facts, offered exhibits, or arguments related to any such claim.

*C. Fourteenth Amendment*

In order to state a Fourteenth Amendment Due Process claim, a plaintiff must show he was deprived of a liberty interest protected by the Fourteenth Amendment. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Coleman v. Dretke*, 395 F.2d 216, 221 (5th Cir. 2004). Generally, an inmate has no protectable liberty interest or property interest in his custodial classification and, therefore, no liberty interest in obtaining or retaining classification in General Population. *Wilson v. Budney*, 976 F.2d 957, 958 (5th Cir. 1992).

The Due Process Clause "does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." *Sandin v. Connor*, 515 U.S. 472, 478 (1995). Instead, a prisoner's liberty interest is "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. The Supreme Court made clear in *Wilkinson* "that there is no dispositive bright line between deprivations resulting from initial custodial classifications and deprivations resulting from disciplinary measures." *Wilkerson v. Goodwin*, 774 F.3d 845, 852 (5th Cir. 2014) (citing *Wilkinson*, 545 U.S. 209, 213 (2005)). Courts have recognized, however, that extreme conditions of confinement in some instances can involve such atypical and extraordinary circumstances that such confinement can implicate a liberty interest. *See, e.g.,*

13

*Wilkinson,* 545 U.S. at 221 (Supreme Court recognized that the use of solitary confinement in Ohio's Supermax facility crossed the line); *Hernandez v. Velasquez*, 522 F.3d 556, 562-63 (5th Cir. 2008) (solitary confinement can be used in a way that "imposes atypical and significant hardship.");[2] *Wilkerson ,* 774 F.3d at 855-57 (two prisoners in decades-long closed-cell restrictions similar to the solitary confinement in *Wilkinson* had a cognizable due process interest in Louisiana's classification system). Following this line of reasoning, the Fifth Circuit has concluded that restrictive placements of less than two-and-a-half years do not implicate due process and that placements of more than five years likely do. *Wilkerson*, 744 F.3d at 855; *Bailey v. Fisher*, 647 F. App'x 472, 476-77 (5th Cir. 2016). The Fifth Circuit has concluded that a court must consider both "the nature of the more restrictive confinement and its duration in relation to the prison norms and to the terms of the individual's sentence." *Wilkerson*, 744 F.3d at 853 (quoting *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008)). Potentially indefinite placements heighten due process concerns. *Id*. at 855.

### 1. Liberty Interest

Here, the undersigned must determine whether plaintiff has established that his ten plus year placement in administrative segregation implicates a liberty interest protected by the Due Process Clause. Defendants argue the conditions of confinement in restrictive housing at the Polunsky Unit are not extraordinary – nor are they atypical. Motion for Summary Judgment, pg. 17 (docket entry no. 14). Defendants provide as competent summary judgment evidence the Restrictive Housing Plan ("the Plan") that delineates three levels of security detention for purposes of restrictive housing. Ex. G, Restrictive Housing Plan (docket entry no. 14-8). The Plan explicitly states that "[r]estrictive

---

[2]In *Hernandez*, the Fifth Circuit found that the conditions complained of, shared cell for twelve months with permission to leave only for showers, medical appointments, and family visits, were less severe then those found unactionable in other cases. 522 F.3d at 562.

housing is a non-punitive, maximum custody status involving the separation of an offender from general population for maintaining safety, security, and order among offenders, staff and the public." *Id*., pg. 12. An offender is considered to be in restrictive housing any time the offender is separated from the general population by confinement, by themselves, in a cell for 22 hours or more each day. *Id*. The Plan acknowledges the risk to these offenders for developing symptoms of anxiety or other mental health issues in light of these restrictions and requires regular psychological assessment and treatment to preserve their behavioral health. *Id*.

There are three levels of restrictive housing offenders. *Id*. All restrictive housing offenders are ineligible for: (a) promotion above the time-earning class of SAT IV; (b) contact visits; (c) emergency absence; and (d) job assignment or for participation in education programs. *Id*., pg. 42. Restrictive housing offenders must be housed in a single cell specifically designated for housing security detention offenders and require constant armed supervision outside the security perimeter and require escort to and from activities outside the offender's assigned cell. *Id*.

Plaintiff has been designated as a Level 1A Security Detention offender since October of 2010 due to his MM affiliation. Ex. F, Portions of Plaintiff's STG File and Classification Review Screenshots, pgs. 11-25 (docket entry no. 14-7). As a Level 1 offender, plaintiff is allowed one non-contact visit each week. Ex. G, pg. 42.

> Level I Security Detention is used to designate offenders who generally maintain good behavior but require separation from general population offenders. Offenders assigned to this custody may have a history of assaultive behavior, but the offender's current behavior, within the last 90 days, is non-assaultive behavior.

Ex. G, pg. 13. Level 1 offenders are also allowed: (1) one hour per day, seven days a week, with two hours of the weekly out-of-cell recreation taking place outdoors; or (2) two hours, five days a week

with two hours of the weekly out-of-cell recreation taking place outdoors.  *Id.*, pg. 26.  According to the Plan, indoor recreational areas shall be equipped with a minimum of one exercise mat, one chinning bar, a game table, a toilet, and a drinking fountain.  *Id.*  Outdoor recreation yards shall have a hard surface, asphalt or concrete, one basketball goal, one basketball or handball, and one chinning bar.  *Id.*, pg. 27.

Any offender in restrictive housing is permitted to write and receive correspondence and shall be provided writing instruments, stationery, and postage either by accessing their offender trust fund account or through the provisions for indigent supplies.  *Id.*, pg. 28.  Level 1 offenders specifically may spend $70 for commissary items every two (2) weeks for regular purchase items.  *Id.*  Level 1 offenders are permitted to purchase a fan and other cooling items sold in the commissary such as cooling towels and electrolyte drink mix.  *Id.*  They are also allowed approved special purchases, such as a typewriter, radio, and other similar types of purchases.  *Id.*

Any offender in restrictive housing is permitted to retain personal property such as legal materials, religious books or articles, photographs, letters and approved publications, general library books, and correspondence supplies, to name a few.  *Id.*, pgs. 29-30.  All offenders in restrictive housing shall be provided the opportunity to take a shower seven days per week.  *Id.*, pg. 31.  Offenders in restrictive housing shall have access to educational services where required, access to counselors and chaplains, access to health care services, provided medication as prescribed, and, when necessary for treatment, access to confidential consultations in the housing area.  *Id.*, pg. 32.

In response, plaintiff states he spends 22 ½ to 24 hours alone in his cell and is denied the opportunity to share in group meals.  Declaration, pgs. 3-6 (docket entry no. 27-3); *cf Wilkinson*, 545 U.S at 214 (inmates must remain in their cells 23 hours per day; all meals are taken alone in the

16

inmate's cell instead of a common eating area); *Wilkerson v. Goodwin*, 774 F.3d at 856 (5th Cir. 2014) (prisoners are isolated in their cells for 23 hours a day); *Bailey v. Fisher*, 647 F. App'x at 474 (5th Cir. May 6, 2016) (lockdown 23-24 hours a day in a one-person cell).  Plaintiff complains he is denied regular phone calls, contact visits, vocational, recreational, educational, and religious programming and is stripped searched every time he leaves his cell.  *Id*., pgs. 4-6; *cf Wilkerson*, 774 F.3d at 849 (inmates on CCR faced restrictions on "personal property, reading materials, access to legal resources, work and visitation rights," and could not "attend religious ceremonies" or "take advantage of education opportunities [and] training"); *Bailey*, 647 F. App'x at 474 (no access to any privileges or programming in prison - such as religious gatherings, educational and vocational programs, entertainment, canteen, or packages); *Tate v. Starks*, 2013 WL 5914398, *3 (N.D. Miss. Nov. 4, 2013) (no visitation or phone calls allowed during the first six months on the STG tier, and thereafter, visitation and other privileges, including participation in various programs, depended on progression through the gang renunciation process).  Although less than clear, it appears plaintiff's cell is closed with a solid steel door with one opening for the food slot tray.  *Id;*[3] *cf Wilkinson*, 545 U.S. at 241 (OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates); *Bailey*, 647 F. App'x at 474 (cell outfitted with a solid steel door, with the only opening controlled by prison guards for purposes of meals and prisoner count; the set-up prohibited cell-to-cell conversation); *Tate, *3 (N.D. Miss. Nov. 4, 2013) (Tate and the other STG inmates were also housed in single cells, but behind bars, rather

---

[3]The Plan states that [t]he implementation of offender management status and use of a solid outer door shall be in accordance with AD-03.80, "Implementation of Offender Management Status."  Ex. G, pg. 25 (docket entry no. 14-8).  The Plan also states that "[c]ells that house restrictive housing offenders shall have all the permanent fixtures of cells that house general population offenders."  *Id*.  Plaintiff does describe his cell as containing three small windows, one at the top of his cell and two others that contain wire mesh.  It's unclear if these are designed to facilitate communication contact (albeit non-contact) with other inmates.  Declaration (docket entry no. 27-3).

17

than solid doors.  The inmates could talk to one another, though the cells were arranged so they could not readily see one another); *Escobarrivera v. Vannoy*, 2021 WL 1604872, \*5 (M.D. La. Feb. 24, 2021) (cells are open and allow for communication between inmates like all cells at all other cellblocks at the Louisiana State Penitentiary).  Plaintiff also complains that the only human contact he has is when a guard handcuffs him to leave or enter his cell or if medical staff touches him during a medical appointment. *Id*; *Wilkerson*, 774 F.3 at 856 (significant limitations on human contact); *Bailey*, 647 F. App'x at 474 (any time he left his cell, he was handcuffed through a "mailbox"-like structure, minimizing physical contact with prison guards - and strip searched); *but see Hope*, \* 7 n. 5 (to the extent Hope complains of the type of human contact he has as compared to prisoners in general population fails as a matter of law) (citing *Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir. 1983)).

Plaintiff complains further that he can only request a phone call every 90 days, he is allowed one weekly non-contact visit, he gets a 15 minute shower every day, he can go to 1 to 2 hours recreation in a day room cage three days per week or go to outside recreation for 1 to 2 hours two days per week.  *See* Declaration;[4] *cf Wilkinson*, 545 U.S. at 214 (during the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells; opportunities for visitation are rare and in all events are conducted through glass walls); *Wilkerson*, 774 F.3d at 856 (the exercise allowed in the one hour outside of their cells is limited to isolated areas); *Bailey*, 647 F. App'x at 474 (on the days Bailey left his cell to exercise, he remained isolated from other prisoners; visitation either non-existent or rare and strictly no contact; telephone use either prohibited

---

[4]Whether plaintiff exercises his right to use the phone every 90 days or weekly non-contact visits is less than clear based off information provided in plaintiff's Declaration and exhibits.  Plaintiff complains of the infrequency and the cost to use the phone and complains about the harshness of non-contact visits.  Plaintiff admits he did not regularly use the opportunity to call or visit his mother despite the opportunity to do so before her death.

or rare and showered only three times per week); *Tate*, *3 (because there were several pens for yard calls at Unit 32, as opposed to just two at the OSP, inmates had more of an opportunity to visit with others during Unit 32 recreation time); *Escobarrivera*, *5 (the seven hours of out-of-cell time per week inmates in CCR receive is to roam the entire tier rather than being confined to another small room; allowed two contact visits per month); *Queens v. Adams*, 2012 WL 1081227, *3 (N.D. Tex. Feb. 27, 2012) (plaintiff had frequent contact with a variety of people; he can talk to other inmates in nearby cells and can have a weekly two-hour non-contact visit from a visitor in the free world; plaintiff is not confined to a building for twenty-four hours a day, but is allowed outside most days for an hour to recreate).   Plaintiff states he can leave his cell only for court dates, official visits by parole, attorney visits, friend or family visits, and medical appointments.  *Id*.  Plaintiff complains further he can only communicate with and/or see other inmates through his cell door (or wall) and in the recreation cages by screaming or yelling.  *Id;[5] cf. Escobarrivera*, *5 (plaintiff, though in segregated confinement, had contact with "a variety of people," and was able to talk to inmates in nearby cells).  Notably, plaintiff does not complain of adverse lighting conditions except to complain that the flashing lights used by guards at night disturb his sleep.  *Id.; see Wilkinson*, 545 U.S at 214 (in *Wilkinson*, a light remained on in the cell at all time, though it was sometimes dimmed, and an inmate who attempted to shield the light to sleep was subjected to further discipline).

---

[5]Although not discussed by either party, the undersigned notes the Restrictive Housing Plan specifically addresses the concern for the health and well-being of offenders housed under these conditions.  The Plan states, "[b]ecause offenders in restrictive housing are restricted from normal movement within the facility, it is imperative they are visited by key staff members who can ensure their health and well-being are maintained.  Rounds from these staff members shall be documented on the AD-54, Employee and Visitor Log, and on the Daily Activity Log, I-216." Ex. G, pg. 38.  The warden or duty warden "shall" visit each restrictive housing area daily and conduct a weekly inspection.  *Id*.  Qualified heath care professionals are "required" to visit each restrictive housing area daily, unless medical attention is needed more frequently.  *Id*.  Members of program staff, including chaplains, classification staff, grievance staff, case mangers, risk managers, etc. are "required" to visit each restrictive housing area weekly, on a rotating schedule, unless attention from a specific program staff member is needed more frequently.  *Id*.

While there are similarities between the conditions faced by plaintiff and the inmates in the seminal cases of *Wilkinson*, *Wilkerson* and *Bailey*, *Wilkinson* did not hold that the Due Process Clause is applicable to every restrictive housing placement. Two factors present in the case of the Ohio Supermax Prison – in addition to the isolation imposed – convinced the Supreme Court that the severe conditions triggered a liberty interest. Those factors were:

1.    The period of confinement was for an indefinite time period, with the only clear-cut time limits on duration being either the length of the inmate's sentence or of his life, and;

2.    Supermax confinement eliminated the possibility of parole for any otherwise eligible inmate.

*Wilkinson*, at 223.

Plaintiff alleges his confinement in restrictive housing is indefinite due to "sham" and "meaningless" classification reviews and the alleged inflexible requirement he renounce his gang affiliation in order to gain entry into the GRAD program. Amended Complaint, pg. 5 (docket entry no. 2); Response to MSJ, pg. 28 (docket entry no. 27-2). Defendants argue confinement in restrictive housing due to an STG validation is not indefinite due to the periodic classification review process and the availability of the GRAD program. Motion for Summary Judgment, pg. 17 (docket entry no. 14).

In reviewing the indefiniteness of a restrictive housing placement, the Fifth Circuit has looked to "rote repetition" and whether the original reason for placement in lockdown can ever change. *Wilkerson v. Goodwin*, 774 F.3d 845, 856 (5th Cir. 2014) (quoting *Wilkerson v. Stalder*, 2013 WL 6665452, *9 (M.D. La. Dec. 17, 2013)). While plaintiff alleges the defendants here engage in "rote repetition" when repeatedly denying him release from restrictive housing due to his refusal to debrief, a distinction can be made between the present case and in *Wilkerson* cases. The plaintiffs

in *Wilkerson* were placed in restrictive housing due to their charge and later conviction of murdering a correctional officer (Woodfox and Wallace) and fellow inmate (Wilkerson) while in prison – a status that could never change. *Id*. Here, plaintiff has substantial influence over his length of stay in restrictive housing by agreeing to renounce his gang membership. Plaintiff refuses to do so out of concerns of being labeled a snitch and putting his life in danger or that of his family. Because the reason for plaintiff's placement in restrictive housing can change with his willingness to renounce and participate in the GRAD program, the undersigned believes the indefinite nature of plaintiff's restricted housing is ameliorated by TDCJ's GRAD program. *See Queen v. Adams,* 2012 WL 1081227, *3 (N.D. Tex. Amarillo Feb. 27, 2012) (plaintiff's confinement in administrative segregation because of his Security Threat Group classification did not trigger due process concerns even though plaintiff argued that if he does not renounce his gang membership, he could remain in Administrative Segregation until he discharges his sentence; "the indefinite nature of placement in Administrative Segregation, by itself, was not the decisive factor in *Wilkinson*"); *see also Tate v. Starks*, 2013 WL 5914398, *4 (N.D. Miss. Nov. 4, 2013) (indefinite nature of confinement ameliorated by MDOC's gang renunciation program which provided a clear path for getting back to general population; "Tate's early refusal to enter into this program extended that stay. With earlier cooperation, Tate could have returned to general population sooner");

As to parole, plaintiff concedes he receives one parole hearing per year but argues his placement in restrictive housing due to his STG status has a negative impact during his parole review. The standard, however, is whether a restricted housing placement *eliminates* the possibility of parole for an otherwise eligible inmate. *Wilkinson*, at 223 (emphasis added) ("initial placement at the OSP denies some inmates the chance to be considered for parole because of a Department

policy"). By plaintiff's own admission, that does not appear to be the case. Rather, it would appear that plaintiff's refusal to renounce and participate in the GRAD program is a consideration that weighs against him in the parole review decision-making process but does not disqualify him from consideration altogether.

While the length of plaintiff's confinement in restrictive housing is significant on its own, on the present record, it does not appear plaintiff has met this summary judgment burden as to whether his confinement in restrictive housing gives rise to a protectable liberty interest. *Cf., Hope v. Harris*, 2021 WL 2523974, * 5 (5th Cir. June 18, 2021) (Hope has likely established a liberty interest when confined to solitary confinement for over twenty years as an escape risk).[6] Even if plaintiff has somehow shown his confinement in restrictive housing gives rise to a liberty interest, the undersigned finds that plaintiff is not entitled to relief as he has received all the due process required as outline below.

### 2. Due Process

Plaintiff's initial placement into restricted housing and whether there was evidence to support that decision are not at issue in this action because plaintiff does not contest his initial classification as a member of a security threat group. Accordingly, the court must determine if the periodic review of plaintiff's confinement status satisfies due process. The appropriate framework is set forth in *Matthews v. Eldridge*, 424 U.S. 319, 336 (1976), which considers three factors:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function

---

[6] A notable distinction is Hope was told he could not be transferred out of solitary confinement because he has an escape on his record. It appears there is no way this designation will change unlike plaintiff here who has the opportunity to participate in GRAD and ultimately move back to general population.

involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Sriz v. Collier*, 2020 WL 7868102, *8 (S.D. Tex. Nov. 24, 2020) (quoting *Wilkison*, 545 U.S. at 224-25) (quoting *Matthews*, 424 U.S. at 335)).

*a. Private Interest*

"The first *Matthews* factor, the private interest affected by the official action, is to be evaluated 'within the context of the prison system and its attendant curtailment of liberties' because 'the procedural protections to which [prisoners] are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all.'" *Id.* (quoting *Wilkinson*, 545 U.S. at 225). The undersigned has already analyzed the conditions and duration of plaintiff's restrictive confinement in comparison with *Wilkinson*, *Wilkerson* and *Bailey*. The Fifth Circuit has suggested that two and a half years of segregation is a threshold of sorts for atypicality. *Wilkerson*, 774 F.3d at 855. Plaintiff's restricted confinement of ten plus years clearly exceeds that threshold. Assuming, without finding, that the private interest here is significant, the undersigned proceeds to the remaining two factors. *Cf., Hope*, * 5 ("[W]e look to how much liberty Hope is deprived of over and above what would normally be incident to prison life. And so, Hope's interest is low").

*b. Risk of Erroneous Deprivation and Value of Additional or Different Procedures*

"The second factor addresses the risk of an erroneous placement under the procedure in place, and the probable value, if any, of additional or alternative procedural safeguards." *Id.*, *9 (quoting *Wilkinson*, 545 U.S. at 225). The Supreme Court observed in *Wilkinson* that notice of the factual basis for the government's decision and a "fair opportunity for rebuttal" are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson* at 226 (citing *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 15 (1979);

23

*Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985); *Fuenes v. Shevin*, 407 U.S. 67, 80 (1972)).

In *Wilkinson*, the Supreme Court, after finding a protectable liberty interest, held that the procedures for placement of inmates at the Ohio Supermanx Prison were constitutionally adequate. *Wilkinson*, 224-30. The procedures there allowed for inmates to receive notice of the factual basis leading to consideration for placement in the maximum-security prison, a fair opportunity for rebuttal, multiple levels of review with an authority to overturn at each level, and placement review within thirty days of the initial assignment to the facility. *Id.* at 225-29. Although the court in *Wilkinson* found that those procedures satisfied due process, the Court also stressed that where "the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in *Greenholtz*, 442 U.S. 1 [(1979),] and *Hewitt v. Helms*, [459 U.S. 460 (1983)], provide the appropriate model." *Id.* at 228-29. "In both *Greenholtz* and *Hewitt*, due process was satisfied when an inmate received notice of the charges, an opportunity to be heard, and notice of any adverse decision." *Striz*, *9 (citing *Wilkinson*, 229).

Here, the Plan outlines the review procedures after initial placement in restrictive housing. *Id.*, pg. 18.

> 1. All offenders initially placed in restrictive housing shall be afforded an initial hearing within 7 days and shall undergo a documentation review by the RHC (Restrictive Housing Committee) every 7 days for the first 60 days, and at least 30 days thereafter to determine if the offender is suitable for placement in a less restrictive category or custody.

***

24

6.     At the subsequent 7 days and 30-day reviews, the RHC, or SCC (State Classification Committee) if the hearing is combined with the 6-month SCC hearing, shall consider the restrictive housing offender for promotion in time-earning class if eligible, possible change in level, or recommend the offender be released from restrictive housing.  If the restrictive housing offender is on any type of restriction, such as paper gown, paper mask, property, or food loaf restriction, the RHC or SCC shall also review the offender for continuation or removal of the restriction.

*Id*.  Subsequent reviews regarding an offender's assignment to Level I, II, or III during confinement in restrictive housing may be made by the warden, assistant warden, major, security detention security supervisor, or any regularly scheduled RHC or SCC.  *Id*., pg. 20.  All such decisions made by an individual, other than the RHC or SCC, shall be affirmed or denied by the RHC or SCC.  *Id*.

The Plan requires a sixty (60) day State Classification Committee Review of the initial 7-day hearing and then six month subsequent review hearings thereafter.  *Id*, pg. 20.  The SCC consists of a representative of the SCC, the warden or designee and other staff as deemed appropriate.  *Id*.  The Plan requires the offender be given written notice of the hearing at least 24 hours, but no more than two weeks prior to the SCC subsequent review hearing, unless extenuating circumstances exist.  *Id*., pg. 21.  An offender has the right to attend the SCC subsequent review hearing unless the offender presents a threat to the security of offenders or staff by attending the hearing.  *Id*.  An offender has a right to make a statement, submit written statements from witnesses, and submit other documentary evidence during the SCC subsequent review hearing.  *Id*.  If an offender refuses to attend, the hearing may be held in their absence.  *Id*.

Based on the evidence presented at the SCC subsequent review hearing, and the criteria for an offender's release from security detention, the SCC shall determine whether reasons exist to continue the confinement of the offender in security detention.  If the SCC determines the offender shall remain in security detention, the SCC must further determine if any of the current

> conditions or restrictions will change, or if the level of assignment will change.

*Id.* An offender shall be provided written documentation of the decision, including the reasons for the decision and summarizing the information presented and considered. *Id.* Unit administration may request to have an offender reviewed prior to the six-month review. *Id.*, pg. 22. "The RHC shall make the request for a special review in writing to the chairman of the SCC and shall include justification for the review and possible removal from security detention in the request." *Id.* Furthermore, the unit administration and the UCC may appeal classification decisions by filing an appeal with the Departmental Review Board ("DRB"). Ex. C, TDCJ Classification Plan, pg. 33. The DRB has final authority for staff appeals of offender classification decisions. *Id.*

The Plan also outlines eight step-down programs: (1) cognitive intervention pre-release program, (2) mental health therapeutic division program, (3) cognitive intervention transition program, (4) chronically mentally ill program, (5) gang renouncement and disassociation process, (6) program for aggressive mentally ill offenders, (7) returning population gang renouncement and disassociation process, and (8) serious and violent offender reentry initiative. *Id.*, pgs. 22-23. The Gang Renouncement and Disassociation (GRAD) program "is designed to give an STG member the ability to disassociate with their current affiliation, with the possibility of being assigned to general population following successful completion. The curriculum provides cognitive intervention, anger management, substance abuse education, and programming addressing criminal addictive behavior." *Id.*, pg. 23. The Restrictive Housing Plan states that "[t]he release of STG offenders assigned to security detention custody shall be in accordance with the *Security Threat Group Plan*." *Id.* (emphasis in original). The guidelines for recommendations for release from restrictive housing state the following:

1.    The RHC may make recommendations to the SCC for removal of an offender from extended restrictive housing who is between routine SCC reviews.

2.    When considering the release of an offender from security detention to the general population, the SCC may base the decision on whether the offender would still be:

    a.    An escape risk;

    b.    A physical threat to staff or other offenders; or

    c.    A threat to the order and security of the prison as evidenced by repeated, serious disciplinary violations.

3.    In addition to using professional judgment and assessing the above criteria, the SCC may consider the following factors relating to the offender's behavior while assigned to security detention:

    a.    Any disciplinary violations, including the seriousness and frequency of the violations;

    b.    Medical evaluations;

    c.    Relationships with other offenders and staff;

    d.    Participation in programs in which the offender is eligible to participate; and

    e.    The offender's expressed desire to remain in, or stated readiness to be released from, security detention.

4.    If the offender is released from security detention by the SCC, the SCC shall determine the offender's custody designation.

5.    Efforts shall be made to ensure offenders released from security detention transition through one of the available stepdown programs if possible.

*Id*., pg. 24. Offenders have the right to appeal the decisions of the RHC and SCC. *Id*.

Pursuant to the Security Threat Group Plan, "[a]n offender has an opportunity to disassociate from membership in a gang. Should the offender request to do so, the Unit Security Threat Group

Officer ("USTGO") shall begin the process of disassociation in accordance with the STG Operations Manual." Exhibit E, pg. 13. The Security Threat Group Management Office ("STGMO") has the final authority to determine whether an offender has successfully completed the disassociation process and any decision by the STGMO may be appealed by a requesting unit and the offender. *Id.*

The Gang Renouncement and Disassociation ("GRAD") Process provides a method for offenders to renounce their membership from a Security Threat Group ("STG"). *Id.*, pg. 16. An offender shall express in writing to the USTGO a desire to renounce their membership in a STG. *Id.* "Those offenders willing to renounce their gang affiliation shall be required to participate in the process and associated activities until successful completion is attained. This process is approximately nine (9) months in duration." *Id.* Upon completion of GRAD, the offender shall be released into general population and placed on a unit determined by the SCC. *Id.* Should an offender fail to successfully complete the GRAD process, the offender shall be returned to administrative segregation. *Id.* The STGMO makes the final decision on any matters relating to the GRAD process. *Id.* The GRAD process comprises three phases:

1.  Phase I is approximately two (2) months in duration and the curriculum consists of substance abuse information, Alcoholics Anonymous, and chaplaincy videos.

2.  Phase II is approximately four (4) months in duration and the curriculum consists of cognitive intervention anger management/substance abuse, and criminal addictive behavior.

3.  Phase III is approximately three (3) months in duration and allows the offender to transition into the general population, providing them the opportunity of being assigned a job and the ability to participate in all regularly scheduled unit academic and volunteer based programs.

*Id.*[7]

The Offender Orientation Handbook informs offenders that they may request to be considered for the GRAD Process.  Exhibit B, pg. 45.  "After approval, the offender shall complete the GRAD process before they are reviewed for release from administrative segregation and returned to general population status."  *Id*.  "Those willing to renounce their gang affiliation are required to participate in the process and associated activities until successful completion is attained."  *Id*., pg. 57. Interested offenders should send an I-60 to the Unit STG Officer.  *Id.*

In the present case, plaintiff admits he has been provided periodic review of his classification status.  Amended Complaint, pg. 16 (docket entry no. 2).  Moreover, plaintiff does not allege, let alone provide evidence demonstrating, that he did not receive notice of any classification hearing or that he was not provided an opportunity to challenge his classification decision.  *Id*.  In fact, the competent summary judgment evidence shows that plaintiff has refused to attend his classification

---

[7]An offender, upon return to the custody of TDCJ, may be eligible for The Administrative Segregation Diversion Program ("ASDP") which also provides a method for offenders to renounce their membership from a STG.  *Id*., pg. 17.  Upon return to the custody of TDCJ, an offender shall be interviewed by the USTGO to determine the offender's desire to renounce membership in a STG.  *Id*.  "Offenders willing to renounce their gang affiliation shall be required to participate in the program and associated activities until successful completion is attained.  This process is approximately six (6) months in duration."  *Id*.  After successful completion of this process, an offender shall be released into general population on a unit determined by the SCC.  If the offender fails to successfully complete the ASDP program, the offender shall be placed in administrative segregation in accordance with procedures outlined in the TDCJ Administrative Segregation Plan.  *Id*.  The STGMO has the final authority on any matters pertaining to the ASDP program.  *Id*.  The ASDP program consists of two phases:

1.     Phase I

       Phase I is approximately two (2) months in duration and the curriculum consists of substance abuse information, Alcoholics Anonymous, and chaplaincy videos.

2.     Phase II

       Phase II is approximately four (4) months in duration and the curriculum consists of cognitive intervention, anger management, substance abuse, and criminal addictive behavior.

*Id*.

hearings despite the opportunity to do so. *See generally*, Exhibit D, Plaintiff's UCC and SCC Records (docket entry no. 14-4). Since his arrival at TDCJ in August of 2010, plaintiff has been reviewed regularly, the last review as of the date of this Report and Recommendation being on November 10, 2020. *See* Exhibit F, Plaintiff's STG file and Classification Review Screenshots, pgs. 11-26 (docket entry no. 14-7). At each review, it is recommended plaintiff remain at Level 1A due to his status as a confirmed member of MM. *See generally* Exhibit D.

In addition, since the pendency of this case, plaintiff has repeatedly asserted he has no intention to participate in GRAD. Plaintiff argues that the requirement to renounce and debrief puts his life at risk and the lives of those in his family. While plaintiff contends that despite no disciplinary history and no gang involvement, he has no notice, other than renouncing and debriefing, as to how he can gain release from restrictive housing, such an argument is unavailing. Plaintiff clearly has notice of the procedures in place, he simply does not agree with them. The record reflects plaintiff is given advance notice of the review hearings, is provided an opportunity to be heard during the hearings, can submit written statements from witnesses and other documentary evidence, and is informed of the factual basis of the review committees' decision. Furthermore, TDCJ policy allows the UCC to make recommendations to the SCC regarding placement, as well as the ability of the unit warden and others to make requests to the SCC regarding an inmate's removal from restrictive housing. These are additional procedural protections that are in place. The undersigned thus finds that the procedural mechanisms in place properly reduces the risk of erroneous placement and that this factor weighs in the defendants' favor. *Cf., Hope*, * 5-6 (Hope had notice of the factual basis for his placement in solitary and a fair opportunity for rebuttal); *Striz*, * 11 (finding same on TDCJ policy for restrictive housing and GRAD); *see also Johnson v. Ryan*,

2020 WL 736352, at *5-6 (D. Arix. 2020); *Hernandez v. Schriro*, 2011 WL 2910710, at *8-9 (D. Ariz. 2011); *Mendez v. Ryan*, 2013 WL 6408389, at *8 (D. Ariz. 2013); *Standley v. Ryan*, 2012 WL 3288728, at *9-10 (D. Ariz. 2012); *Faulkner v. Ryan*, 2012 WL 407452, at *9-10 (D. Ariz. 2012) (all holding ADC's periodic review, combined with the ability to debrief at any time, satisfies due process).

      *c. Government's Interest*

      The third factor also weighs against plaintiff. The Government's interest in avoiding the burdens of additional procedural requirements in the context of prison management is a "dominant consideration." *Hope*, * 6 ("[G]overnment's interest outweighs Hope's interest and the process he is given suffices to satisfy the constitutional requirement of the Fourteenth Amendment"); *Striz*, * 11 (citing *Wilkinson*, 545 U.S. at 225) (explaining that a state's "first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves")). The State of Texas clearly has a significant interest in managing prison facilities, maintaining order among its personnel and inmates, and preserving scarce resources. "[A] court 'must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards. . . ." *Id*. (citing *Wilkinson*, 525 U.S. at 227-228).

      Classifying a prisoner as part of a security threat group is directly related to prison safety. "'Prison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status.'" *Wilkerson v. Maggio*, 703 F.2d 909, 911 (5th Cir. 1983) (quoting *McGruder v. Phelps*, 608 F.2d 1023, 1026 (5th Cir. 1979)). "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Striz*, * 11 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). "Where a state penal system is involved, federal

courts have 'additional reason to accord deference to the appropriate prison authorities.'" *Id*. (quoting *Turner v. Safely*, 482 U.S. 78, 85 (1987) (citing *Procunier*, 416 U.S. at 405)).

Based on the foregoing analysis, the undersigned finds that the process afforded plaintiff regarding his continued placement in restrictive housing is constitutionally adequate. Again, plaintiff is provided with advance notice of the review hearings, he is provided an opportunity to speak at the hearings, he can submit written statements from witnesses, he can submit other documentary evidence, and he is given notice of the factual basis for the reviewing committees' decision. The government's interest in ensuring the safety of its personnel, the public and prisoners is especially strong. Plaintiff has shown that any private interest tips the balance in his favor. Because plaintiff has failed to show a constitutional violation as to the defendants in their individual capacity, they are entitled to qualified immunity as to plaintiff's due process claim.

## D.  *Eighth Amendment*

As outlined above, plaintiff alleges TDCJ's uniquely harsh regime of prolonged administrative segregation at Polunsky is inhumane and debilitating. Supplemental Complaint, pg. 7 (docket entry no. 7). Plaintiff states the defendants have persistently denied him the normal human contact necessary for a person's mental and physical well-being. *Id*. Plaintiff contends he experiences anxiety, hypersensitivity, depression, and post-traumatic stress disorder, ailments he never experienced before being housed in administrative segregation. *Id*., pg. 10. Plaintiff states he has serious physical ailments and illness caused or exacerbated by his prolonged incarceration under the harsh conditions of administrative segregation including eye and vision problems, migraine headaches, chronic back pain and insomnia. *Id*. After he filed his complaint, plaintiff was diagnosed with hypertension requiring medication and Hepatitis C which causes swelling in both his legs and

feet. *Id.*, pg. 14. Finally, plaintiff asserts the GRAD program is a dangerous program as it requires prisoners to divulge secret information about a gang which puts plaintiff at serious risk of injury or death if he participates in the program. *Id.*, pg. 13.

Plaintiff alleges the defendants are aware of the deleterious effects of extended segregation on inmates as found in the 2015 investigative report issued by the American Civil Liberties Union of Texas and Texas Civil rights Project called, "A Solitary Failure: The Waste, Cost, and Harm of Solitary Confinement in Texas." According to plaintiff, this investigative report involved the participation of current and past TDCJ officials and prisoners within TDCJ's security housing units. *Id.*, pg. 9. Plaintiff cites the report in support of the theory that rates of suicide, attempted suicide, and self-harm in solitary confinement are far higher than rates in the general population and that solitary confinement causes permanent mental deterioration. *Id.* Plaintiff cites further to an August 2011 report by the United Nations, "Special Rapporteur of the Human Rights Counsel on Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment," which allegedly concludes "the use of solitary confinement is acceptable in only exceptional circumstances, and that its duration must be as short as possible and for a definite term that is properly announced and communicated." *Id.*, pg. 13. In addition, plaintiff cites to two additional publications: "Prisons No Longer Use Solitary," by Keri Blakinger, San Antonio Express News, September 24, 2017 and "Ex-Gangster Denounces Gangs, and Is Shot Dead," by Martin Selsoe Sorensen, The New York Times, November 22, 2018. Supplemental Complaint, pgs. 15-17. In the former, plaintiff contends Senator John Whitmire, Chairman of the Texas Senate Criminal Justice Committee was quoted as saying, "I've been concerned about their overusing administrative segregation for years . . . I'm convinced that if you're not emotionally disturbed when you go in there, you will be when you get out." Plaintiff

33

references the Sorensen article as an example of an ex-gang member denouncing his gang only to end up being fatally shot.

Plaintiff's reliance on the investigative report issued by the American Civil Liberties Union, plaintiff's Human Rights Complaint, the United Nations' Report and the two articles in the San Antonio Express News and New York Times is misplaced. None of these documents are sworn to nor certified and the authors are not subject to cross-examination. This constitutes inadmissible hearsay and incompetent summary judgment evidence that cannot be considered by this court. *Armour v.* Davis, 2020 WL 2850140, * 12 (E.D. Tex. 2020); *Hicks v. Charles Pfizer & Co., Inc.*, 466 F.Supp.2d 799, 804-05 (E.D. Tex. 2005) (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005)); *The Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 166 n. 8 (3rd Cir. 2001); *Miller v. Tony & Susan Alamo Found.*, 924 F.2d 143, 146 (8th Cir. 1991); *Pennington v. Vistron Corp.*, 876 F.2d 414, 427 n. 15 (5th Cir. 1989); *Dallas County v. Commerical Union Assur. Co.*, 286 F.2d 388, 392 (5th Cir. 1961); *Achee v. Port Drum Co.*, 197 F.Supp.2d 723, 730 n. 5 (E.D. Tex. 2002); *Ladner v. City of N.Y.*, 20 F.Supp.2d 509, 519 (E.D.N.Y. 1998), *aff'd*, 181 F.3d 83 (2nd Cir.), *cert. denied*, 528 U.S. 1006 (1999); *Dowdell v. Chapman*, 930 F.Supp. F.3d 533, 541 (M.D. Ala. 1996); *Tilton v. Capital Cities/ABC, Inc.*, 905 F.Supp. 1514, 1544 (N.D. Okla. 1995), *aff'd*, 95 F.3d 32 (10th Cir. 1996), *cert. denied*, 519 U.S. 1110 (1997). Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent summary judgment evidence and will not be considered by this court. *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); FED. R. CIV. P. 56(c)(2).

*1. Conditions*

In his Declaration attached to his response to the Motion for Summary Judgment, plaintiff

states the following with respect to his injuries in more specificity:

20.  I now suffer from both mental and physical injuries I did not suffer from prior to my confinement in ad seg.  On or about March 2011, I arrived to Polunsky Unit ad seg.  Over time I lost a normal sleeping pattern and found myself sleeping 1 to 3 hours each day at different hours of the day and night. This was caused by several factors, mainly being confined to a cell the size of a parking space for 22 and one-half to 24 hours each day, within ad seg. Ad seg is loud at all hours of the day and night.  Steel doors slam open and shut every 30 minutes as guards conduct counts, and, at night they flash lights on your face to see you.  Also, there are prisoners screaming and yelling and banging at all hours of the day and night.  It did not take long for me to have severe chronic insomnia.  Imagine being confined to a small area of your home [like I am in ad seg].  Men and women walking through your home all day long every 30 minutes; and, men and women walking through your home and slamming doors all night long every 30 minutes, and shining a flashlight on you in your face.  All the while your next door neighbors of your home, throughout the day and night, screaming, yelling, and banging [like I experience each day and night in ad seg].  Over a period of time, you will have insomnia. [I did].

After I realized I had insomnia I noticed I began to suffer from acid reflux, and migraine headaches.  Over time I became very ill.  Something didn't feel right.  So I went to medical and they diagnosed me with hypertension. Medical informed me that my blood pressure was so high it was borderline "stroke."  I did not suffer from none of these things prior to being housed in ad seg.

The next thing I noticed right away was my vison would be blurred quickly while trying to read.  As time wen ton I had difficulty focusing and being able to concentrate.  Especially while trying to read or study.  I found myself at different times reading the same page of a book over, or being stuck on the same paragraph for 20 to 30 minutes.  I found myself unable to focus and read an entire magazine article.

The lack of social interaction and environmental stimuli affected me greatly. I did not experience symptoms of depression or anxiety, prior to being housed in ad seg.  My depression and anxiety ar [sic] direct results of being housed in ad seg.  And my ad seg confinement has exacerbated my post-traumatic stress disorder ("PTSD").  See Exhibit C.

35

21.  Exhibit C attached to this Declaration are true and correct copies of inmate request to official(s) (aka "I-60")'s dated 12/09/2019 & 12/15/2019, submitted by me to Mental Health Department's, Ms. Falk & Supervisor at Polunsky Unit, describing mental health issues, and complaint on their record keeping.

22.  As asserted in above Nos. 5 & 20, when I arrived to TDCJ in 2010, I did not suffer from any physical or mental health issues.  My PTSD was not bothering me.  The physical illnesses I experienced after being housed in ad seg were (A) migrane [sic] headaches (See Exhibit D); (B) seeing blood in my stool whenever using the restroom, and, after tests being performed on me, Medical Practitioner, Paul K. Reilly, informed me I suffered from a bleeding ulcer (See Exhibit D); (C) Acid reflux disease (See Exhibit D); Hypertension (See Exhibits A & D); (E) Hepatitis C (See Exhibit B); Swelling in my feet, legs and ankles, later causing more pain to my knees, and spine (See Exhibit E); & (G) Vision problems (See Exhibit N).

23.  Exhibit A attached to this Declaration is a true and correct copy of my medical record, dated 06/11/2019, at Polunsky Unit showing it was first noted I had high blood pressure on 08/01/2017.  Exhibit N attached to this Declaration is a true and correct copy of my medical record, dated 9/28/2020, at Polunsky Unit showing I was diagnosed with vision problems and set for an eye exam.

24.  Exhibit B attached to this Declaration is a true and correct copy of my medical record, dated 07/25/2019, at Polunsky Unit showing it was on 07/24/2019 I was found to test positive for Hepatitis C.

25.  Exhibit D attached to this Declaration is a true and correct copy of my medical record, dated 06/20/2019, at Polunsky Unit showing it was observed I suffered from: migrane [sic], on 03/30/2018; acid reflux disease, on 08/22/2017; bleeding ulcer, on 08/01/2017; and hypertension, on 09/17/2020.

26.  Exhibit E attached to this Declaration is a true and correct copy of my sick call request, dated 09/17/2020, at Polunsky Unit to the Medical Department, showing that my swelling was worsening and causing me pain to my knees and spine.

27.  My vision began to deteriorate.  When I try and read my vision becomes blurry.  I have trouble reading for 20 or 30 minutes.  I did not suffer from vision problems prior to being housed in ad seg.

28.  My spinal chord is now in constant aching pain throughout the day and night.  I did not suffer from back pain prior to being housed in ad seg.

29.  I suffer from chronic insomnia.  Ad seg is loud all day and night, as described in above No. 20.  In ad seg I'm not able to maintain any consistent normal sleeping pattern.  My days and nights overlap.  I lose track of the date and of what day it is due to insomnia.  I did not suffer from insomnia prior to being housed in ad seg.

30.  I suffer from severe anxiety.  It feels like being punched hard in my stomach and tickled all at once.  I feel this anxiety, sporacially [sic], each day. It causes me severe pinched nerve pain in my neck's back area.  It causes my neck's nerves to tense stiffly, making it difficult to turn my neck side-to-side. It causes severe pinched nerve pain in my back's upper shoulder blade areas, and making it impossible to sleep due to the pain.  I also suffer from panic attacks and it causes me to have trouble breathing and, makes me feel like I'm having a stroke.  I did not suffer from anxiety prior to being housed in ad seg.

31.  I suffer from hypersensitivity, and PTSD.  Loud and sharp noises affect my senses to the extreme.  When a steel cell door, prison steel door, or steel barred door or gate open and close – my senses are extremely sensitive to the noise they create.  Any slam, or bang, causes my heart to jump and it makes me feel as if something horrific, or potentially deadly has occurred – as if an AR-15 was next to my ear and someone shot off a round without me being aware the shot was about to be fired [which is not normal as all it is is steel door popping open and being closed in ad seg].  While serving prison time in Beaumont United States Penitentiary, I was stabbed and assaulted on my birthday [September 27th], in 2002, by inidentifiable [sic] prisoners.  The assault against me caused me to suffer from PTSD.  But, the PTSD was managable [sic] prior to being housed in ad seg.  Once I was housed in ad seg it set off my PTSD and caused hypersensitivity.  Each day it bothers me more and it's difficult to cope with in this ad seg environment as described in above No. 20.

32.  I suffer from chronic depression.  I noticed that after being housed in ad seg I lost hope.  I felt like giving up on doing things, such as for example, learning, art, self-improvement planning and studying, exercising, singing, corresponding with family, friends, and loved ones, meeting new people or friends, listening to music.  I felt a constant despair, sadness, and anger. When I hear a song on the radio, a news story, or reminescing [sic] about a past experience with a family member or friend, sporadically, I find myself becoming emotional [which all of the above is not normal behavior for me]. I became an unhappy person.  I did not suffer from depression prior to being housed in ad seg.

33.  I now have trouble concentrating, trying to learn, and read.  I order books to read that interest me, with a desire to read them.  Then as I start to read them I'm not able to focus and maintain enough concentration to finish a chapter.  I stay stuck and find myself rereading the same sentence(s) over-and-over.  It's not normal.  I notice this and I know I was not like this prior to being housed in ad seg.

*** 

82.  After my submission of my I-60's to Mental Health Department's Ms. Falk, and Supervisor, dated December 9 & 15, 2019 – both Ms. Falk and the Polunsky Unit Mental Health Supervisor, came to speak to me at my cell in ad seg.  <u>See</u> Exhibit C.  They asked me to put an I-60 and request counseling by Ms. Falk in a legal booth.  I asked Ms. Falk if such a one-on-one counseling session would be confidential?  Ms. Falk informed me that no such visit with her would be confidential.  I told Ms. Falk "no thank you." I also to Ms. Falk and the Mental Health Supervisor "they did not have the authority to help me."  I told them "my problem was being housed in ad seg, and ad seg was causing me problems – and they cannot order my release from ad seg, so they can't help me – and, I refuse to be placed on psych meds like other prisoners in ad seg trying to cope with mental issues - I don't need to be turned into a zombie, like I see other prisoners in ad seg on psych drugs." <u>See</u> Exhibit C, dated 12/09/2019, at ¶ 4, Ls. 37-40.

Declaration, Exhibit Z (docket entry no. 27-3).

Assuming that plaintiff has alleged physical injuries that are more than *de minimis*, to maintain an action under the Eighth Amendment, plaintiff must meet two requirements.  First, he must show that his confinement resulted in a deprivation that was "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation and citation omitted).  It is well settled that "the Constitution does not mandate comfortable prisons," and that prison conditions may be "restrictive and even harsh" without running afoul of the Eighth Amendment.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see also id.* at 347 (noting that such conditions are "part of the penalty that criminal offenders pay for their offenses against society").  Nonetheless, conditions may not be "grossly disproportionate to the severity of the crime warranting imprisonment." *Id*.  The

Supreme Court has defined a "sufficiently serious" deprivation under the Eighth Amendment as the denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (quoting *Rhodes*, 452 U.S. at 347). At a minimum, prison officials "must provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care. *Farmer*, 511 U.S. at 832 (internal quotation marks and citations omitted). They cannot deprive prisoners of the "basic elements of hygiene." *Palmer v. Johnson*, 193 F.3d 346, 352-53 (5th Cir. 1999) (quotation marks omitted). Prison conditions cannot inflict "wanton and unnecessary" pain. *Id.* at 351.

"*Some* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (internal quotation marks and quoted source omitted). However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id*. at 305.

Here, the crux of plaintiff's complaint is that he does not agree with TDCJ policy regarding the conditions imposed for restrictive confinement and alleges that those long-term conditions have caused him to suffer certain physical and mental ailments.[8] Plaintiff, however, does not allege that he has been deprived of food, clothing, shelter, hygiene or medical care and concedes he can go to

---

[8]Defendants argue that the Polunsky Unit's accreditation with the ACA is dispositive on the issue of deliberate indifference. Motion for Summary Judgment, Exhibit A, pg. 4 (docket entry no. 14-1). While relevant, the undersigned does not believe such an accreditation is proof that Eighth Amendment standards have not been violated. *See Roak v. Flanery*, 2014 WL 4447451, * (E.D. Tex. 2014); *see also Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004).

1 to 2 hours recreation in a day room cage three days per week or go to outside recreation for 1 to 2 hours two days per week.

Even assuming plaintiff can show a sufficiently serious deprivation, he also must show that prison officials acted with "deliberate indifference" to his health or safety. *Id*. This follows from the principal that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Id*.; *see also id.* at 837 ("The Eighth Amendment does not outlaw cruel and unusual 'conditions;' it outlaws cruel and unusual 'punishments.'"). A prison official acts with deliberate indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id*. at 847. This knowledge requirement is subjective: The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

Assuming further the evidence creates a fact issue as to whether plaintiff suffers from anxiety, hypersensitivity, depression, post-traumatic stress disorder, vision problems, migraine headaches, chronic back pain, insomnia,[9] hypertension, a bleeding ulcer, and Hepatitis C as a result of his restrictive housing confinement, there is nonetheless no indication these conditions pose a substantial risk of serious harm. *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (holding that inmate could not show deliberate indifference because there was no evidence that he was ever placed at substantial risk of serious harm); *Colgrove v. Williams*, 105 F. App'x 537, 538 (5th Cir. 2004) (per curiam) (holding that inmate did not establish an Eighth Amendment violation when he

---

[9]Plaintiff offers no specifics as to how much sleep he gets. Regardless, he concedes he has declined psychological services. *Cf., Hope*, * 8, n. 6 ("although Hope also generally alleges excessive noise and sleep deprivation, on the face of Hope's complaint, it is not clear if the alleged noise is serious enough to cause sleep deprivation or how much sleep Hope actually gets. Without such allegations, Hope has not alleged that he 'has been deprived of the minimal measure of life's necessities'").

had been kept in administrative segregation for more than a decade because he did not show that such confinement deprived him of the "minimal measures of life's necessities" or that prison officials acted with deliberated indifference) (citing *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999)). The competent summary judgment evidence submitted by both defendants and plaintiff show that medical care is available to plaintiff and plaintiff makes no complaint that he has not been treated by medical staff when he has sought treatment for these ailments. While the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards, there is no evidence of serious physical, mental, or psychological harm caused by the conditions or duration of plaintiff's segregation. *Cf., Hope*, * 8 n. 5 ("to the extent that Hope has alleged an Eighth Amendment violation based on the sheer length of his confinement, this claim also fails") (citing *Hutto v. Finney*, 437 U.S. 678, 685 (1978) and *Grabowski v. Lucas*, 1994 WL 652674, at *3 (5th Cir. Nov. 11, 1994) (per curiam)). In fact, plaintiff concedes he has refused the psychological help offered to him in his own Declaration. Medical records provided by plaintiff also show he refused attempts to monitor his blood pressure from August 1, 2017 through September 27, 2018, the date when plaintiff was finally started on blood pressure medication, Ex. A pg. 2 (docket entry no. 27-4). Moreover, plaintiff has failed to sufficiently show that any of the defendants were personally deliberately indifferent to a perceived substantial risk of serious harm to plaintiff yet disregarded that risk by failing to take reasonable steps to abate it. *Hope*, * 8 (Hope who complained of unsanitary conditions, including urine feces, and mold on the walls, floor and showers, insufficient cleaning supplies and exposure to pepper spray and tear gas without decontamination, not alleged here, failed to state a claim for deliberate indifference as to his conditions of confinement as it was unclear from Hope's complaint if any of the defendants, with the exception of Major Rehse, were even aware of

41

the conditions of which he complains) (citing *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019)). Liability under § 1983 may not be premised on a theory of *respondeat superior* or on a finding of mere negligence. A defendant's deliberate indifference must be the "moving force" behind the unconstitutional deprivation. *Monell v. Dept' of Soc. Servs. of City of New York*, 436 U.S. 658, 692-94 (1978); *Wilson v. Seiter*, 501 U.S. 294, 305-06 (1991).

The undersigned also finds relevant whether there is an existence of feasible alternatives in determining whether prolonged segregation constitutes cruel and unusual punishment. *Isby v. Brown*, 856 F.3d 509, 523 (7th Cir. 2017) (citing *Meriwether v. Faulkner*, 821 F.2d 409 (7th Cir. 1987)). Here, plaintiff is afforded the opportunity to participate in the GRAD program to return to general population and remove these restrictive conditions but chooses not to do so.

Based on the foregoing, plaintiff has failed to show a genuine dispute of material fact as to deliberate indifference. As plaintiff has failed to show a constitutional violation as to the defendants in their individual capacity, they are entitled to qualified immunity as to plaintiff's claim for deliberate indifference with respect to the conditions of his confinement in restrictive confinement.

### 2. Debriefing

Plaintiff alleges the defendants implement and enforce a policy which is deliberately indifferent to his health and safety by requiring him to debrief. By requiring him to debrief, plaintiff argues this policy put him at serious risk of injury or death if he chooses to participate in the program. The Eight Amendment requires prison officials to protect prisoners from violence a the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To establish an Eighth Amendment violation, as previously sated, plaintiff must first satisfy an objective requirement – he must show that he has been transferred into "conditions posing a substantial risk of serious harm."

42

*Id*. at 834.  Then, he must satisfy a subjective requirement – he must show that the defendant was aware of the risk and disregarded it.  *Id*. at 834, 837.  Courts have recognized that being labeled a snitch can place an inmate at a risk of harm.  *See Valandingham v. Bojorquez*, 866 F.2d 1135, 1138-39 (9th Cir. 1989); *see also Wilkinson*, 545 U.S. at 227 ("[t]testifying against, or otherwise informing on, gang activities can invite one's own death sentence").

In the present case, however, plaintiff concedes he has not attempted to debrief; thus, he has not actually been placed in harm's way.  Consequently, plaintiff cannot demonstrate that he has been or is about to be exposed to a serious risk of harm.  Plaintiff's safety concerns are speculative given that he has not attempted to debrief.  Without debriefing, plaintiff is not at risk of placement in general population and thus not subject to a risk of harm.  The defendants are not required to predict all inmate behavior; they are only required to protect a prisoner from harm when they are aware of the harm or presented with facts from which an inference can and should be drawn that a risk of harm exists. *See Acosta v. Pople*, 2011 WL 1885644, * 5 ("[t]o the extent that plaintiff complains that Ramsey Unit UCC members or the GRAD staff subjected him to a substantial risk of harm by his classification and placement in the GRAD program, he fails to state any facts to show that such defendants were aware of a specific threat to him from which they could infer that he faced a substantial risk of harm by his actual placement in GRAD, that they drew such inference, or that they failed to take action to protect him) *(citing Farmer*, 511 U.S. at 837, 841–42 (a defendant may be liable if he has actual notice of conditions that pose a substantial risk of serious harm or if he is exposed to circumstantial evidence concerning the risk and "must have known" about it) and *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1991) (stating that to prevail, plaintiff must show prison officials were deliberately indifferent to his need for protection)); *see also Faulkner v. Ryan*, 2012

WL 407452, * 12 (D. Ariz. Feb. 9, 2012) (plaintiff who has not attempted to debrief could not demonstrate he has been or is about to be exposed to a serious risk of harm with potential to be placed in "protective segregation" if he agreed to debrief); *Rotondo v. Ryan*, 2012 WL 424384, * 11 (D. Ariz. Feb. 9, 2012) (same); *Freemon v. Ryan*, 2011 WL 5169342, * 15 (D. Ariz. Oct. 31, 2011) (same); *Standley v. Ryan*, 2012 WL 3288728, * 11 (D. Ariz. Aug. 13, 2012) (overruling risk but on other grounds) (same).[10]   In sum, plaintiff fails to present any specific facts or evidence to show a genuine issue of material fact on the subjective prong of the deliberate-indifference analysis.  *See Matsushita*, 475 U.S. at 587. As such, he cannot demonstrate that debriefing violates his Eighth Amendment rights and defendants are entitled to qualified immunity with respect to plaintiff's claim against them in their individual capacities.

E.  *Injunctive Relief*

In January of 2019, plaintiff sought leave to add claims against defendants Eva Shiver and Michael Butcher who replaced defendants Robert Grant and Tod Harris in their respective positions (docket entry no. 47 & 64).  On April 29, 2020, the defendants informed the court that defendants Tod Harris, Michael Butcher and Robert Grant all had left their respective positions within TDCJ. Motion to Dismiss, pg. 5 (docket entry no. 37 in 9:17c23 – original case).  The undersigned previously determined that plaintiff cannot seek prospective injunctive relief as to former Polunsky Warden Todd Harris, former Polunsky Warden Michael Butcher and former Security Threat Group Program Supervisor Robert Grant in their official capacities due to the fact that they all left their

---

[10]In *Faulkner*, *Rotondo*, *Freemon*, and *Standley* the court explained that an STG member is not housed with other inmates if they debrief but is placed in protective segregation which the court found a reasonable response to a risk.  Regardless, the court held that because plaintiff had not debriefed, he could not show that he has faced or will face a substantial risk of serious harm in protective segregation.  On the present record, it is unclear if an STG member in TDCJ who debriefs is placed in general population once he completes GRAD or is placed in some sort of protective segregation.

respective positions.  *See* Report and Recommendation (docket entry no. 7), Memorandum Opinion and Order Adopting (docket entry no. 1).  Plaintiff never sought leave to amend his complaint to add the current Warden of the Polunsky Unit.   Regardless, the "public officer's successor is automatically substituted as a party."  *See Hope v. Harris* (citing *Ganther v. Ingle*, 75 F.3d 207, 210 & n.7) (5th Cir. 1996)).  Thus current Warden Daniel Dickerson is automatically substituted in as a party.

As to the remaining defendants in their official capacity, Executive Director Brian Collier, Security Threat Group Program Supervisor Eva Shiver, and Warden Daniel Dickerson, however, plaintiff has failed to establish a constitutional violation of a federal right and, as such, is not entitled to prospective injunctive relief.  *Ex parte Young*, 209 U.S. 123 (1908); *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001).

Recommendation

Defendants' Motion for Summary Judgment should be granted and this case should be dismissed with prejudice.

Objections

Within fourteen (14) days after receipt of the Magistrate Judge's report, any party may serve and file written objections to the findings of facts, conclusions of law and recommendations of the Magistrate Judge.  28 U.S.C. § 636(b)(1)(c).

Failure to file written objections to the proposed findings of facts*,* conclusions of law and recommendations contained within this report within fourteen (14) days after service shall bar an aggrieved party from the entitlement of *de novo* review by the district court of the proposed findings,

45

conclusions and recommendations and from appellate review of factual findings and legal conclusions accepted by the district court except on grounds of plain error. *Douglass v. United Services Automobile Associatio*n, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

**SIGNED this the 28th day of July, 2021.**

KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE